**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.   **CV 24-10088-JFW(RAOx)**                        Date:  April 28, 2026

Title:        Candace Rushing -*v*- Life Insurance Company of North America

---

**PRESENT:  HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

**Shannon Reilly**                                        **None Present**
**Courtroom Deputy**                                   **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
                None                                                None

**PROCEEDINGS (IN CHAMBERS):        FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Candace Rushing ("Plaintiff") brings this action under the Employee Retirement Income Security Act ("ERISA") against Defendant Life Insurance Company of North America ("LINA"), challenging the calculation of long-term disability ("LTD") benefits under a group policy issued by LINA. There is no dispute that Plaintiff was "disabled" or that LINA paid LTD benefits through the maximum benefit period.  The primary question before the Court is whether LINA correctly calculated her Covered Earnings.

On March 10, 2026, LINA filed its Opening Trial Brief, and on March 11, 2026, Plaintiff filed her Opening Trial Brief.   On March 10, 2026, Plaintiffs and LINA both filed their Proposed Findings of Fact and Conclusions of Law. On March 13, 2026, the Court found this matter appropriate for decision without a trial and, with the consent of the parties, vacated the Court Trial calendared for March 24, 2026. On March 17, 2026, Plaintiff and LINA filed their Responsive Trial Briefs.

After considering all of the admissible evidence,[1] the Court makes the following findings of

---

[1]To the extent that the Court has relied on any evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.  Notably, the only extrinsic evidence (outside of the administrative record) relied upon by the Court relates to the appropriate standard of review to apply. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) ("The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest[.]");*Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998) ("[C]onducting limited discovery for the purpose of determining the appropriate standard of review does not run afoul of the general

Initials of Deputy Clerk __sr__

fact and conclusions of law:

## **FINDINGS OF FACT**[2]

### A.    The Plan and Policy

As a benefit of her former employment with Peet's Coffee & Tea ("Peet's"), Plaintiff participated in the Peet's Coffee & Tea Employee Benefits Plan (the "Plan").  LINA issued Group Policy No. FLK-960476 (the "Policy") effective May 1, 2010, which insured the long term disability ("LTD") benefits of the Plan.

The Policy contains the following "Disability Benefit Calculation" provision:

> The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits and the Return to Work Incentive.  Monthly Benefits are based on a 30-day month.  The Disability Benefit will be prorated if payable for any period less than a month.

AR 11.  The Gross Disability Benefit is 60% of "[t]he lesser of the percent of an Employee's monthly Covered Earnings . . ., rounded to the nearest dollar, or the Maximum Disability Benefit." AR 10. "Covered Earnings" is defined as:

> Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins.  **It includes earnings received from commissions but not bonuses, overtime pay or other extra compensation.**  Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of the change, if the Employer gives us written notice of the change and the required premium is paid.
>
> Commissions will be averaged for the 24 months just prior to the date Disability begins, or the months employed, if less than 24 months.

AR 10 (emphasis added).

The Policy contains an integration clause, which provides:  "The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the

---

prohibition on admitting evidence outside the administrative record for the purpose of determining benefits.");  *Hertan v. Unum Life Ins. Co. of Am.*, 2015 WL 12819131, at * (C.D. Cal. Jan. 6, 2015) ("[A] district court may consider extrinsic evidence in deciding the appropriate standard of review . . . .").

[2]The Court has elected to issue its decision in narrative form because a narrative form more fully explains the reasons for the Court's conclusions.  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

Initials of Deputy Clerk __sr__

applications, if any, of the Insureds." AR 23.  The Policy provides:  "No change in the Policy will be valid until approved by an executive officer of the Insurance Company.  This approval must be endorsed on, or attached to, the Policy."

The Policy includes an Amendatory Rider, signed by the President of LINA and attached to the Policy, which provides in relevant part:

> This Policy has been issued in conjunction with an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA").  As respects the Insurance Company, it is the sole contract under which benefits are payable by the Insurance Company.  Except for this, it shall not be deemed to affect or supersede other Plan documents.

> The Plan Administrator has appointed the Insurance Company as the named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims.

AR 24.

Neither the Policy nor the Amendatory Rider include any language conferring discretion on LINA.  However, an undated separate document, entitled "Employee Welfare Benefit Plan: Appointment of Claim Fiduciary" ("ACF"), provides that "Claim Fiduciary shall have the authority, in its discretion, to interpret the terms of the Plan, including the Policies; to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." AR 34. The ACF includes both the Plan Number (501) and the Policy number (FLK-960476) and was signed by Vice President Laila Tarraf for the Plan, and President Matthew G. Manders for the Claim Fiduciary LINA.

According to a Senior Operations Representative of LINA, the signed ACF form, along with other Plan implementation documents, were forwarded to LINA on April 9, 2010.  Lodi Declaration (Docket No. 50-3) ¶ 4.  LINA then issued the Policy, effective May 1, 2010.

Until this litigation, neither Plaintiff nor her counsel had received a copy of the ACF.

**B.     LINA Approved and Paid Plaintiff's LTD Claim Until She Failed to Submit Required Proof of Loss.**

Plaintiff began employment with Peet's in 2007.  On March 10, 2010, Plaintiff suffered a knee injury during the course of her work. She ceased working permanently on June 29, 2010.

In April 2011, Plaintiff submitted her claim for LTD benefits under the Policy, claiming to be disabled as of September 21, 2010 (but with a March 10, 2010 date of injury) from her occupation as a Route Sales [Representative]" due to "degenerated condition, bones broken into pieces due to work conditions."  AR 57-58.   It is undisputed that Plaintiff met the definition of "Disabled" under the Policy.

LINA requested and reviewed Plaintiff's employment and payroll records from Peet's.

Initials of Deputy Clerk __sr__

According to the records, Plaintiff began working for Peet's in 2007, earning $23.75 per hour with no commission.  On September 6, 2009, Plaintiff received a promotion and commensurate raise to $8.10 per hour plus commission.  Plaintiff worked 45 hours per week.

On July 15, 2011, LINA advised Plaintiff that she met the Policy's definition of "Disabled". LINA stated that benefits would begin December 26, 2010 based on a June 29, 2010 date of disability[3] and following satisfaction of the Policy's 180-day elimination period.  LINA further stated that Plaintiff's monthly benefit of 60% of her Covered Earnings would be reduced by Other Income Benefits and applicable taxes, as provided in the Policy.  Based on the information available at the time, LINA advised Plaintiff that her monthly benefit would be $948.00. This benefit calculation was solely based on Plaintiff's hourly base rate of $8.10 and her 45 hour per week schedule, without accounting for Plaintiff's commissions.

In early October 2011, representatives from LINA and Peet's exchanged emails regarding Plaintiff's pre-disability income and her previously omitted commissions. On October 10, 2011, LINA recalculated Ms. Rushing's monthly LTD benefit to include commissions paid from September 18, 2009 to June 25, 2010 to arrive at an increased monthly benefit of $2,281.00. Although Plaintiff only received commissions over a period of 10 months, LINA averaged the commissions by 12 months and included months of partial commission pay and one pay period where no commissions were earned.

On June 20, 2012, LINA received confirmation that Plaintiff had received a total of $47,274.59 in temporary disability workers' compensation benefits ($942.29 per week from April 28, 2010 through June 13, 2010, and then from July 14, 2010 through May 24, 2012) and had also received permanent workers' compensation benefits of $270.00 per week from May 25, 2012 to March 22, 2013.  Accordingly, in a letter dated October 31, 2013, LINA advised Plaintiff that she had been overpaid in the amount of $5,462.30 on her LTD claim and requested that she contact LINA to discuss reimbursement of the overpayment.

In a letter dated January 18, 2019, LINA advised Plaintiff that it was paying her the minimum of $100 per month under the Policy based on a monthly gross benefit of $2,281.00, and offsets of $1,653.00 for primary Social Security Disability Insurance ("SSDI") benefits and $996.67 for workers' compensation.  LINA confirmed these benefits and offset amounts in a March 1, 2019 letter, which attached highlighted copies of LINA's payments to Plaintiff from August 19, 2011 to February 19, 2019 documenting recovery of the overpayment to Plaintiff.  On March 14, 2019, LINA advised Plaintiff that her requested monthly benefit breakdown was enclosed and informed her of the right to appeal.  Plaintiff did not appeal the benefit calculation at that time.

LINA wrote to Plaintiff on July 23, 2020, September 2, 2020, October 15, 2020, and November 19, 2020 to request that she complete and return supplementary claim forms.  Because Plaintiff did not respond, LINA advised Plaintiff by letter of December 16, 2020 that it was closing her LTD claim effective December 25, 2020 for failure to provide proof of loss.

---

[3]LINA confirmed with Peet's that Plaintiff's last day of work was June 28, 2010 (although she had been placed on a leave of absence pending surgery after June 28, 2010).

Initials of Deputy Clerk _sr_

**C.** **LINA Reinstated Plaintiff's LTD Benefits and Reimbursed Underpaid Benefits.**

By letter dated May 24, 2021, Plaintiff appealed the termination of her disability benefits.  In a letter dated September 12, 2021, Plaintiff argued that LINA's benefit calculation was incorrect because LINA had relied upon a base pay of $8.10 per hour or $648.00 per pay period for the 12 months preceding her date of disability, plus commission.  This resulted in Covered Earnings of $3801.54 per month and in a monthly benefit of $2,281 per month.  Plaintiff argued that her pay for the first seven pay periods of the 12 months preceding her date of disability was $23.75/hour, for a total of $1,900 per biweekly pay period. Plaintiff further stated that because Peet's required her to work 5 hours of overtime every week, these hours and compensation should have been included in her Covered Earnings, even though the Policy excluded overtime pay in the definition of Covered Earnings. Finally, Plaintiff stated that LINA had incorrectly offset her workers' compensation settlement at the "monthly PD rate" rather than being prorated over five years as required by the Policy. She alleged that her workers' compensation offset should have expired in December 2019.

After reviewing Plaintiff's appeal, LINA advised Plaintiff by letter of November 17, 2021 that it was vacating its prior decision and reinstating her claim, but apparently at the minimum of $100 per month.

On November 30, 2021, Plaintiff wrote to LINA to dispute the reinstatement of her LTD benefits at the minimum of $100 per month and to request a complete audit of her historical benefit payments. She enclosed copies of her pay stubs from June 21, 2009 to September 13, 2009, as well as her own calculations. Plaintiff also attached a copy of a December 12, 2014 Order Approving Compromise and Release of Award indicating that she had been awarded $146,400 in her workers' compensation settlement ($180,000 total, less attorneys' fees of $27,600 and permanent disability advances of $10,000).

After review of Plaintiff's calculations, on December 15, 2021, LINA re-calculated Plaintiff's Covered Earnings as follows: Bi-weekly base pay: $648.00, resulting in a monthly base pay of $1,404.00; Commissions of $2,907.31 per month; and Total Covered Earnings of $4,311.31 per month. By letter dated December 15, 2021, LINA advised Plaintiff that it believed that its calculation of her Covered Earnings at $4,311.31 per month was correct.  However, LINA agreed that Plaintiff's monthly workers' compensation offset of $1,447.37 should have terminated on December 22, 2019, 60 months after the lump sum was initially paid. LINA requested additional information regarding her SSDI benefits in order to determine any underpayment owed.  On December 15, 2021, LINA also sent Plaintiff a letter enclosing a copy of the Policy and a copy of the "Covered Earnings" calculation.

On January 28, 2022, Plaintiff submitted her appeal with an explanation of her calculations for her pre-disability income, her SSDI offset calculation, and a September 25, 2016 letter from the Social Security Administration stating that her monthly benefit as of September 2016 was $1,833.00. Prior to this time, LINA did not have the SSDI award notification and had been using an estimated SSDI offset amount of $1653. In addition, Plaintiff claimed that her Covered Earnings should have been $6,016.79 per month for a monthly LTD benefit of $3,610.09 based on her 45-hour (including 5 hours of overtime) workweek.  She further argued that LINA was improperly continuing to take an offset for her workers' compensation settlement and that her SSDI offset should be capped without cost of living adjustment ("COLA") benefit increases at her 2012 SSDI

Initials of Deputy Clerk  _sr_

benefit amount.

On February 23, 2022, following a telephone conversation with LINA's Appeals Specialist, Plaintiff sent an email to memorialize their telephone conversation.  Plaintiff stated that her Covered Earnings should be re-calculated based on pre-injury earnings (i.e., from September 6, 2009 to March 19, 2010) because she was unable to work at full capacity after her injury. She reiterated that her "regular and customary" workweek should also include five hours of overtime because she was required to work 45 hours every week by Peet's.  She concluded that LINA owed her a balance of $16,769.75.  LINA called Plaintiff on March 4, 2022 to advise that LINA would review the evidence submitted.

On March 31, 2022, Plaintiff again emailed LINA, stating that the additional five overtime hours she worked each week should have been calculated at 1.5 times her base rate of pay *plus* commissions, arguing that none of this was "extra" pay because she worked 45 hours and received this compensation every week. LINA replied the following day to advise that her weekly earnings were calculated at the "regular" pay rate instead of the time-and-a-half overtime rate because the Policy excluded overtime from its Covered Earnings definition. In addition, LINA advised that according to her date of disability and the terms of the Policy, which stated that Covered Earnings were based upon the average of the 24 months prior to the date of disability, Plaintiff's monthly Covered Earnings were calculated to be $4,394.37, as she did not begin receiving commissions until September 18, 2009.

After further review and internal discussions with LINA's financial team and receipt of additional information from Plaintiff, including Worker's Compensation information and the Social Security award, LINA determined that Plaintiff was owed an underpayment of $96,174.61 and advised Plaintiff of this determination by letter of April 5, 2022. Importantly, LINA agreed that because Plaintiff "consistently worked 45 hours per week," "the hours used to calculate [her] earnings were corrected to 90 hours per two week period, at [her] regular pay rate of $8.10 per hour."  AR 1577.  This increased her monthly base salary to $1,579.50. In addition, LINA corrected its calculations of her commissions. Specifically, because Plaintiff did not begin receiving commissions until September 18, 2009, LINA corrected its calculations to average Plaintiff's commissions by 10 months versus 12 months, resulting in a monthly average commission of $2,814.87. Her Covered Earnings were therefore recalculated as $4,394.37 per month. LINA also agreed that her SSDI benefit offset should have been $1,833.00 per month starting April 1, 2015 and that her workers' compensation offset should have terminated in December 2019 (with a monthly deduction of $1,447.37, i.e., $89,841.91 divided over 5 years).

LINA issued two checks for underpayment of benefits: one check was issued on April 5, 2022, in the amount of $78,704.61, and the other check was issued on April 6, 2022, in the amount of $17,470.

LINA continued paying benefits at the recalculated monthly rate to Plaintiff through January 28, 2024, when she reached the maximum benefit period under the terms of the Policy.

**D.    Plaintiff Continued to Dispute Calculations of LTD Benefits and Exhausted Her**

Initials of Deputy Clerk __sr__

**Administrative Remedies.**

On March 18, 2024, Plaintiff sent a detailed letter to LINA to again dispute the Covered Earnings calculation. She now asserted that her disability began on April 18, 2010 when she first left Peet's to recover from knee surgery, and that her second leave of absence for knee-related issues starting June 29, 2010 should have been considered a "successive period of disability" according to the Policy. While Plaintiff agreed that she began receiving commissions in September 2009, she again argued that the additional five hours of overtime she worked each week should have been calculated at 1.5 times her hourly rate plus commissions because she was required to work five hours of "overtime" every week by Peet's and that such compensation was not "extra" compensation under the Policy. Notably, she advised LINA that the payroll department at Peet's calculated her weekly compensation as follows:

> They first determined the hourly compensation rate for the week by adding the base and the commission together, and dividing by 40.  For example, if my base was $300, and I earned $900 in commission, the total, $1,200, would be divided by 40 hours. The result, in this example $30, would be the hourly rate for the week.  The 5 hours in excess of 40 would be calculated at time-and-a-half rate by multiplying 5 x 1.5 x $30 for a total of $225.  They added the 40-hour base, the commission, and the 5 hours at the time-and-a-half rate, to get the total wages.

AR 1700.  Plaintiff believed that her monthly Covered Earnings should have been $6,014.06 for a LTD monthly benefit of $3,608.00. Plaintiff also stated that LINA owed her $120,929.51 for interest on the unpaid benefits. She alleged that the interest accrued on delayed benefits was $67,763.97 and the interest accrued on benefits that remained unpaid was $56,165.54.  Plaintiff also explained the enormous hardships she had to endure because of LINA's failure to properly calculate her benefits.  This hardship included paying interest on credit cards and ruining her credit, selling possessions to pay for basic necessities, relying on food banks, borrowing money from friends and family to buy food and pay her rent, declaring bankruptcy in 2021, and paying extra income tax when LINA made its lump sum payments for the benefits it improperly withheld in April 2022.

By letter of May 21, 2024, LINA advised Plaintiff that it was denying her appeal regarding her Covered Earnings calculation.  LINA stated in relevant part that Plaintiff's LTD benefit was calculated correctly and that the calculation did include her five extra hours of work per week but only at her base hourly rate of pay of $8.10 (not time-and-a-half).  LINA also advised Plaintiff that the figures she used to calculate her monthly commissions were incorrect. Rather than averaging commissions over the prior 24 months, LINA calculated her commissions using pay stubs dated September 18, 2009 through June 25, 2010, which reflect the period of Plaintiff's occupation as Route Sales Representative (commission-based position). LINA advised that total commissions earned during that period were $28,148.70, resulting in a monthly average of $2,814.87.  LINA advised that combined with her normal monthly wage of $1,579.50, this produced a total Benefit Monthly Earnings ("BME") amount of $4,394.37.  LINA clarified that the standard 24 month commission average was not used because it would not accurately reflect her Covered Earnings at the time disability began.

With respect to Plaintiff's newly alleged date of disability, LINA advised there was insufficient evidence to support this date.  Plaintiff had not submitted any medical evidence

Initials of Deputy Clerk  _sr_

demonstrating she had successive periods of disability. And regardless, because the April 18, 2010 disability date preceded the May 1, 2010 effective date of the Policy, she would have to file a claim with the previous coverage provider for disability beginning on that date. LINA advised Plaintiff that she could submit a response by June 7, 2024, and that if no response was received, LINA would issue its final decision.

Plaintiff responded by letter dated June 6, 2024 and dismissed LINA's explanations. Notably, Plaintiff advised LINA that any issue regarding offsets had been resolved in April 2022. By letter dated June 17, 2024, LINA advised Plaintiff that it was denying her appeal for the reasons stated in its prior May 21, 2024 letter.  LINA advised Plaintiff that her administrative appeals had been exhausted and that she had the right to bring suit under ERISA.  Plaintiff subsequently requested a copy of her claim file through her counsel of record, McKennon Law Group, PC.

On November 11, 2024, LINA sent a letter enclosing a check in the amount of $63,307.25 for the interest due on the underpaid amount from December 26, 2010 to April 6, 2022. The letter also enclosed worksheets reflecting LINA's calculations of interest at 10% for the LTD benefits period from June 25, 2012 to March 25, 2015, and for the LTD benefits period from January 25, 2020 to February 25, 2022.

### E.      Allegations in Plaintiff's Complaint and Opening Brief

On November 21, 2024, Plaintiff filed a Complaint against LINA for recovery of ERISA plan benefits, challenging LINA's calculations of her monthly benefit and Covered Earnings, date of disability, and interest calculations.   Plaintiff claims in relevant part that: (1) her disability began on March 10, 2010, rather than June 29, 2010; (2)  LINA incorrectly calculated her commission income by relying upon the average of her commissions received from September 2009 through June 2010, as this period included some months when she earned partial or no commissions or were based on commissions earned by another employee who covered for her during her absence from work; (3) LINA incorrectly calculated her Covered Earnings by failing to include her five hours of overtime at 1.5 times her regular pay rate (base pay plus commissions); (4) LINA incorrectly offset her California SDI benefits, workers' compensation benefits, and SSDI benefits; and (5) LINA owes her 10% interest on underpaid benefits.

In her Opening Brief, Plaintiff abandoned several of these theories, and primarily argues: (1) LINA incorrectly calculated her commissions income because LINA relied on months were she earned partial or zero commissions and on commissions earned by another employee; (2) LINA incorrectly calculated her Covered Earnings by failing to include her five hours of overtime at 1.5 times her regular pay rate (base pay plus commissions); and (3) LINA incorrectly calculated the interest owed and owes interest on any unpaid benefits.

### CONCLUSIONS OF LAW

I.      **Jurisdiction and Venue**

Initials of Deputy Clerk  _sr_

This action involves a claim to recover benefits under an employee welfare benefit plan that is subject to ERISA.  Accordingly, the Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  *See e.g.*, *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).  Venue in the United States District Court for the Central District of California is appropriate under 29 U.S.C. § 1132(e)(2).

## II.     Standard of Review

"Section 502 of ERISA entitles a participant or beneficiary of an ERISA-regulated plan to bring a civil action to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000) (quoting 29 U.S.C. § 1132 (a)(1)(B)).  A plan administrator's decision to deny benefits is reviewed *de novo*, unless the plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989).

### A.     The ACF Is a Plan Document.

The parties disagree as to whether the Court should review the plan administrator's determination of benefits de *novo* or for abuse of discretion.  LINA contends that the ACF is a Plan document that provided it with the requisite discretion, *see* AR 34, whereas Plaintiff contends that the ACF is not an enforceable Plan document.  The Court recognizes that there is a split of authority over whether LINA's ACF (or virtually indistinguishable ACF) is an enforceable Plan document sufficient to provide LINA with the requisite discretion.  *Compare Raybourne v. Cigna Life Ins. Co. of New York,* 576 F.3d 444, 448-49 (7th Cir. 2009) (concluding that the ACF is a Plan document); *Stull v. Life Ins. Co. of N. Am.*, No. 3:20-CV-291-DCK, 2021 WL 4993485, at *5-7 (W.D.N.C. Oct. 27, 2021) (same); *Moore v. Life Ins. Co. of N. Am.*, No. 6:17-CV-00030, 2018 WL 1461502, at *3 (W.D. Va. Mar. 23, 2018) (same)[4] *with Heim v. Life Ins. Co. of N. Am.,* No. CIV.A. 10-1567, 2010 WL 5300537, at *1-2 (E.D. Pa. Dec. 22, 2010) (concluding ACF was not a plan document); *Francis v. Anacomp, Inc. Accidental Death & Dismemberment Plan*, No. 10-CV-467-BEN-BGS, 2011 WL 4102143, at *3-4 (S.D. Cal. Sept. 14, 2011) (same); *Barbu v. Life Ins. Co. of N. Am.*, 987 F. Supp. 2d 281, 286-89 (E.D.N.Y. 2013) (same); *Moran v. Life Ins. Co. of N. Am. Misericordia Univ.*, No. 3:CV-13-765, 2014 WL 4251604, at *4-8 (M.D. Pa. Aug. 27, 2014) (same); *Pettit v. Life Ins. Co. of N. Am.*, No. RDB-15-2694, 2016 WL 3668022, at *5-9 (D. Md. July 11, 2016) (same); *Turner v. Life Ins. Co. of N. Am.*, No. C17-1 TSZ, 2017 WL 11913489, at *1 (W.D. Wash. July 13, 2017) (same).

The Court finds the reasoning of *Raybourne, Stull,* and *Moore* more persuasive and concludes that the ACF is a Plan document. An ERISA Plan may be made up of multiple documents and "there is no requirement that documents claimed to collectively form the employee

---

[4]Some courts have held that the ACF was a Plan document capable of conferring discretion on LINA on the grounds that it constituted a valid amendment to the Policy because the ACF was "endorsed on, or attached to, the Policy." *See DuPerry v. Life Ins. Co. of N. Am.,* No. 5:08-CV-344-FL, 2009 WL 10681746, at *8 (E.D.N.C. Aug. 10, 2009)*; Ward v. Life Ins. Co. of N. Am.*, No. 1:08CV675, 2009 WL 2740202, at *5 (M.D.N.C. Aug. 26, 2009).  However, in this case, it does not appear that the ACF was endorsed on, or attached to, the Policy.

Initials of Deputy Clerk _sr_

benefit plan be formally labeled as such." *Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125, 127 (9th Cir. 1991).  Here, based on the express language of the Policy, including Amendatory Rider, it is clear that the Policy was not the sole Plan document. *See* AR 29 (noting that the Policy is a Plan document and is the sole contract under which benefits are payable by LINA but that "[e]xcept for this, it shall not be deemed to affect or supersede other Plan documents").   And, as the Seventh Circuit held in *Raybourne*, given that the ACF provides the name of the plan and plan administrator, is signed by representatives of the Plan and LINA, and states that it "shall be effective" from the date of the underlying insurance policy, "it is difficult to see how it could be anything other than a plan document." *Raybourne*, 576 F.3d at 449.  Indeed, the ACF is even entitled: "Employee Welfare Benefit Plan: Appointment of Claim Fiduciary".

Contrary to the reasoning in the cases holding that the ACF is not a plan document, the Court concludes that the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) does not undermine the Seventh Circuit's decision in *Raybourne*.  In *Amara*, the Supreme Court held that "the terms of statutorily required plan summaries ... may [not] be enforced ... as the terms of the plan itself." 563 U.S. at 437.   However, *"Amara* addressed only the circumstance where *both* a governing plan document and an SPD existed, and the plan administrator sought to enforce the SPD's terms *over* those of the plan document." *Prichard v. Metro. Life Ins. Co.,* 783 F.3d 1166, 1170-71 (9th Cir. 2015) (relying on *Amara* to conclude that the SPD was not a Plan document, where insurance contract had an integration clause and the SPD declared that "official plan documents . . . remain the final authority" and "shall govern" in the event the SPD's terms conflict with those of official Plan documents"); *Moore*, 2018 WL 1461502 at * 3 ("All *Amara* holds is that the SPD is not, standing alone, a plan document that can create or override terms of the Plan"). Importantly, a summary plan description or "SPD" is required by the ERISA statute, *see* 29 U.S.C. § 1022(a) and the "syntax of that provision" "suggests that the information *about* the plan provided by those disclosures is not itself *part* of the plan." *Amara*, 563 U.S. at 437. Here, in contrast, the terms of the Policy suggest or contemplate that there are additional Plan documents.  AR 24.

In support of her argument that the ACF is not a Plan document, Plaintiff heavily relies on the integration clause in the Policy, which provides that: "The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds." AR 23.  However, as the district court stated in *Stull*:

> The contract to which the clause refers is presumably the Group Policy itself. Certainly, the integration clause [ ] suggests that the entire *Policy* is comprised of the enumerated documents.  However, there is an important distinction between an insurance policy (which is but one component of the Plan) and the Plan itself (which is comprised of several documents, among them an insurance policy and the ACF). Thus, the Plaintiff's argument that stands heavily upon the integration clause is misguided -- the integration clause does not suggest that the *Plan* is comprised only of the enumerated documents, only that the *Policy* is so limited.

*Stull*, 2021 WL 4993485 at * 7 (cleaned up).

Accordingly, the Court concludes that the ACF is a Plan document, and provides LINA with the requisite discretion to determine eligibility for benefits or to construe the terms of the plan.

Initials of Deputy Clerk  _sr_

### B.    The Court reviews LINA's Decision for Abuse of Discretion.

Because the Plan grants discretionary authority to the administrator, the Court reviews LINA's benefits determination under the Plan for an abuse of discretion.  *Firestone*, 489 U.S. at 115.  Under this deferential standard, "the decision of an administrator will not be disturbed unless the court determines that the decision was arbitrary or capricious." *Horn v. Provident Life & Acc. Ins. Co.*, 351 F. Supp. 2d 954, 958 (N.D. Cal. 2004) (citations omitted). "The touchstone of 'arbitrary and capricious' conduct is unreasonableness." *Clark v. Wash. Teamsters Welfare Trust*, 8 F.3d 1429, 1432 (9th Cir. 1993). An ERISA plan administrator's decision will be upheld if it is grounded "'in *any* reasonable basis.'" *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1041-42 (9th Cir. 2014) (emphasis in original) (citations omitted). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact.*" Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

Because LINA was responsible both for evaluating benefits claims and paying them, LINA operated under a structural conflict of interest, which "must be weighed as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 113 (2008). "While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion."  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012).  The Court's abuse of discretion review is "tempered by skepticism commensurate with the plan administrator's conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006).  As the Ninth Circuit explained in *Abatie*:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968-69 (9th Cir. 2006) (internal citations omitted).

#### 1.    The Court will not consider extrinsic evidence

As an initial matter, the Court must determine whether it should consider evidence outside of the administrative record.  When reviewing ERISA benefits determinations for abuse of discretion, courts are generally limited to the administrative record. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc).  However, "[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." *Id.*  "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by

extrinsic evidence or otherwise." *Id*. Although Plaintiff attempts to submit evidence outside of the administrative record for the Court's consideration, *see* Docket Nos. 39, 40, 43, 45, none of the extrinsic evidence is necessary to decide the nature, extent, and effect on the decision-making process of any conflict of interest. Accordingly, the Court grants LINA's Request to Strike Plaintiff's Extrinsic Evidence (Docket No. 49) and will limit its review to the administrative record (other than was necessary to determine whether the ACF was a Plan document).[5]

> 2.    The Court views LINA's actions with a low level of skepticism.

Plaintiff contends, in relevant part, that the Court should view LINA's actions with a heightened level of skepticism because LINA repeatedly failed to correctly determine Plaintiff's covered earnings, monthly disability benefits, and other benefits offsets. Specifically, Plaintiff claims that LINA erroneously calculated that her monthly LTD benefit was $948 on July 11, 2011, then adjusted her benefit to $2,281 on October 10, 2011, then again adjusted her monthly benefit to $2586.79 on December 15, 2021, and finally adjusted her LTD benefit to $2636 on April 5, 2022. She argues that LINA's admission that it had incorrectly calculated her benefit four times during the administration of the plan benefits is evidence of LINA's failure to properly administer her claim.

Although LINA admittedly made mistakes in calculating Plaintiff's benefits, the Court agrees with LINA that the record generally reflects that LINA engaged in an ongoing, good faith exchange of information and updated Plaintiff's benefits following an interactive process triggered by Plaintiff providing new information. "When an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Abatie*, 458 F.3d at 972. Accordingly, while LINA had a structural conflict of interest, the Court's level of skepticism is low and the Court affords LINA broad deference.

## III.   The Court's Review of LINA's Decisions

### A.    LINA Did Not Abuse Its Discretion in Calculating Plaintiff's Commissions.

The Court concludes that LINA did not abuse its discretion in calculating Plaintiff's commissions.

Plaintiff argues that LINA improperly calculated Covered Earnings by including months in which she earned no commission or only partial commissions, and by allegedly including "another person's commissions." Plaintiff's Opening Trial Brief (Docket No. 38) at 20.

---

[5]To the extent Plaintiff contends that LINA's claims handling and procedural irregularities justify de novo review (and an expansion of the administrative record), the Court disagrees. The record generally reflects an ongoing, good faith exchange between LINA and Plaintiff, and certainly does not reflect the wholesale and flagrant violations required to warrant *de novo* review (or an expansion of the administrative record). *See Abatie*, 458 F.3d at 971-72 (de novo review is reserved for "that rare class of cases" where violations are so "wholesale and flagrant" as to be "in utter disregard of the underlying purpose of the plan.")

Initials of Deputy Clerk __sr__

The Policy provides in relevant part: "Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins." AR 10. "It includes earnings received from commissions but not bonuses, overtime pay or other extra compensation." *Id.* It further provides that "commissions will be averaged for the 24 months just prior to the date Disability begins, or the months employed, if less than 24 months." *Id.* Importantly, the Policy does not exclude months in which no commissions were earned, nor does it authorize selectively averaging only higher-earning months. Accordingly, LINA did not abuse its discretion in averaging Plaintiff's commissions over ten months (the period that Plaintiff's compensation included commissions) .

Plaintiff's assertion that certain commissions belonged to another individual does not alter this analysis. The amounts at issue were paid to Plaintiff and reflected as "commission" in her paycheck, and there is no evidence in the Administrative Record that Plaintiff disputed those payments with her employer or sought correction at the time. On this record, LINA reasonably treated those amounts as Plaintiff's commissions for its benefit calculations.

### B.      LINA Abused Its Discretion in Calculating Plaintiff's Five Hours of "Overtime."

The Court however concludes that LINA abused its discretion in calculating her Covered Earnings for Plaintiff's five hours of "overtime."  Specifically, the Court concludes that LINA relied on clearly erroneous facts.

Although the Policy excludes "overtime pay" from Plaintiff's Covered Earnings, LINA concluded that, because Plaintiff "consistently worked 45 hours per week," the calculation of her Covered Earnings should include all of those hours at her "regular" rate of pay.  *See* AR 1577 ("Based on the review of your payroll documentation, it is agreed that you have consistently worked 45 hours per week, therefore the hours used to calculate your earnings were corrected to 90 hours per two week period, at your regular pay rate of $8.10 per hour.").  In other words, LINA interpreted the Policy to include Plaintiff's five hours of "overtime" per week, but at Plaintiff's regular rate of pay (excluding premium pay).  While the Court concludes that LINA's interpretation of the Policy to exclude her premium pay was reasonable (based on the Policy's exclusion of "overtime pay" from Covered Earnings), the Court concludes that LINA erroneously calculated her "regular" rate of pay for those five hours. It is clear, based on the paychecks provided by Peet's as well as the information provided by Plaintiff during her administrative appeal, that Plaintiff's regular rate of pay for those five hours per week (excluding the premium pay) varied each week and typically ranged from approximately $17 to $33 per hour, and was not paid at Plaintiff's base rate of pay of $8.10 per hour.  *See, e.g.* AR 1372-77; 1700. To be clear, the Court finds it reasonable that LINA did not multiply her regular earnings for those five hours per week at time-and-a-half (1.5x) but the Court finds it unreasonable that LINA did not calculate those five hours per week using her regular rate of pay (1x).

The Court recognizes that LINA's interpretation need not be the one that this Court would have reached, but only an interpretation with rational justification. However, given that LINA determined that Plaintiff's Covered Earnings included 45 hours per week, the Court concludes that it was erroneous and unreasonable to calculate those hours based on her base rate of pay of $8.10 per hour, and not at the rate of pay that Peet's actually used (excluding premium pay) as required by the Policy.  AR 10 ("Covered Earnings means an Employee's wage or salary *as*

Initials of Deputy Clerk __sr_

*reported by the Employer . . . .*") (emphasis added).

**C.     LINA Did Not Abuse its Discretion With Respect to Plaintiff's Claims Concerning Her Date of Disability and the Offsets for California SDI Benefits, Workers' Compensation Benefits, and SSDI Benefits**.

Although Plaintiff challenged LINA's determination of her date of disability of June 29, 2010 and challenged LINA's offset calculations in her Complaint, she abandoned those issues by failing to present any arguments regarding these issues in her Opening Trial Brief (or in her Proposed Findings of Facts and Conclusions of Law).  *See* Docket Nos. 38, 36-1. In any event, to the extent Plaintiff has not abandoned these issues, the Court concludes that LINA did not abuse its discretion.

Specifically, the Court concludes LINA did not abuse its discretion in enforcing the Policy's May 1, 2010 effective date and declining to pay LTD benefits for Plaintiff's disability that allegedly pre-dated the effective date of coverage.  Moreover, LINA reasonably relied upon June 29, 2010 as Plaintiff's date of disability based upon both Plaintiff and Peet's representations that she last worked on June 28, 2010. *See* AR 613, 1546, 1905.

With respect to Plaintiff's offset claims, there is no dispute that the Policy allows LINA to offset California SDI, SSDI, and workers' compensation benefits. AR 16-17.  Plaintiff confirmed that any issues regarding offsets had been resolved in April 2022, *see* AR 1749, and the Court concludes that Plaintiff cannot now introduce extrinsic evidence to support these claims, which were never presented for LINA's administrative review.

**D.     LINA's Interest Calculations and Prejudgment Interest**

As to the delayed and underpaid benefits that LINA has already determined it owed, the Court concludes that LINA paid the correct amount of interest -- $63,307.25 -- based on a payment-by-payment simple-interest calculation grounded in the Administrative Record.  AR 1834-38.  While Plaintiff disputes LINA's interest calculation, ERISA does not require plan administrators to adopt a claimant's preferred formula.

However, because Plaintiff has prevailed on her claim that LINA abused its discretion in calculating her Covered Earnings as to her five hours of weekly "overtime," the Court concludes that LINA owes additional interest on those additional delayed and underpaid benefits. The Ninth Circuit has held that a district court may award prejudgment interest in ERISA cases to compensate a plaintiff for the loss incurred as a result of the defendant's nonpayment of benefits. *See Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001). Whether to award prejudgment interest "is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Shaw v. Int'l Ass'n of Machinists*, 750 F.2d 1458, 1465 (9th Cir. 1985). "[T]he interest rate proscribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001) (citations omitted).

The Court concludes that the balance of equities weighs in favor of an award of

Initials of Deputy Clerk __sr__

prejudgment interest at Plaintiff's requested rate of ten percent.  As Plaintiff advised LINA during the administrative review process, Plaintiff endured enormous hardships because of LINA's failure to properly calculate her benefits.  This hardship included paying interest on credit cards and ruining her credit, selling possessions to pay for basic necessities, relying on food banks, borrowing money from friends and family to buy food and pay her rent, declaring bankruptcy in 2021, and paying extra income tax when LINA made its lump sum payments for the benefits it improperly withheld in April 2022. AR 1708.

## IV.    Remedy

The Court orders the parties to meet and confer, in person, and agree on the amount of benefits and interest owed to Plaintiff, using calculations consistent with the Plan and this Order. The parties shall file a Joint Statement, on or before **May 11, 2026**, setting forth the agreed amount of benefits and interest owed to Plaintiff.  In the unlikely event that the parties cannot agree on the amount of benefits and interest owed to Plaintiff, the Court will remand to LINA for the limited purpose of calculating the amount of benefits and interest owed to Plaintiff, consistent with the Plan and this Order.  *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 460 (9th Cir. 1996)("[R]emand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.").

IT IS SO ORDERED.

Initials of Deputy Clerk __sr__